Alexander Del Giorno, J.
This is a claim for damages for personal injuries sustained by the infant claimant and for medical expenses incurred by his father as a result of the alleged negligence of the State.
On January 9, 1954 the infant, who was then 10 years, 11 months and 25 days of age, resided with his parents at College Campus Village, Long Island Agricultural and Technical Institute, where his father was then attending college.
*382 The testimony of the infant claimant is as follows: At about 4:30 p.m. of that day he went to the cow barn on the school premises with two other boys, Fred Jackson and David Owen. He asked Mr. Wallkam, who was the assistant to Mr. Ferrand, in charge of that area, if they could go into the barn to play. Mr. Wallkam said that would be all right with him if Mr. Ferrand approved. The boy then spoke to Mr. Ferrand, who gave his approval provided Mr. Wallkam agreed. The boy had played there before with permission. The three boys then proceeded into the barn and to the top of bales of hay which were stored there, where claimant had seen other boys swinging from ropes on previous occasions. They began to play tag on top of the bales. At one time while the boys were there on the day in question, Mr. Wallkam came into the barn with a couple of students. The boys threw down some bales of hay to the other group to help them. Near the ceiling was a fork which was used to grasp the hay and get it below to feed the cattle. In order to cause the fork to be lowered, there were two ropes hanging from the ceiling the purpose of which was to serve as a pulley for the fork. At the end of each rope was a knot on which they could sit while holding onto the rope. After playing tag, the boys decided to swing from the ropes. On the right and left sides and at the back of the barn, bales of hay were stacked, and the boys swung from one to another of these. Between the haystacks was a space about 12 feet down from the place where they were playing. Claimant and Owen each seized separate ropes and while swinging out, collided, claimant falling to the floor and Owen falling on top of him. Claimant was unconscious for a few minutes. One of the boys went to get Mr. Ferrand and Mr. Wallkam, and when claimant recovered consciousness he saw his father present with the two other men. Claimant was bleeding from the nose and mouth. His father took him home and called the family doctor, who sent him to Meadowbrook Hospital.
On cross-examination, the infant claimant testified that sometime prior to the accident, he had suffered from rheumatic fever, as a result of which he was not supposed to play too strenuously. Both parents had instructed him not to go into the barn unless his father were present. When he went into the barn, he was aware of the presence of a sign directing that children were not permitted unless accompanied by an adult; he knew further that he had no business in the barn.
David Owen, one of the boys who was with claimant on the day of the accident, testified that they had played in the barn previously after receiving permission to do so. He substantiated claimant on the question of receiving permission to play *383 on the day of the accident from Mr. Ferrand and Mr. Wallkam. He denied that there was a sign to the effect that children were not allowed in the barn without their parents, stating that such a sign went up after the accident. His version of the accident was similar to that of claimant. He fell atop claimant, who appeared to be unconscious, then got up and told one of the students downstairs what had happened, after which he went to call claimant’s father. He had seen other boys on prior occasions climbing upon and running around the haymow. He claimed that he did not know that what he did with claimant was wrong, and stated that this was not the first time that he had swung from the ropes.
The father of the claimant testified that after he had been apprised of the accident by David Owen, he went to the barn, where he found Mr. Ferrand, Mr. Wallkam and a student. The face and ears of his son were being washed of blood coming from his nose and mouth. The only sign he saw was one which stated that children were not permitted near the cows: later, a sign was put up prohibiting children from entering the barn. He carried his son home and called the medical adviser to the school, who ordered the boy to the hospital. He had instructed his son to stay away from the bull pens which were in back of the barn, but had never said anything to him about playing in the barn. The father had been in the barn at least once previously, but had seen nothing in the barn or the hayloft to indicate to him he should forbid his son to enter. He did instruct his son not to go into the bull pen.
The parties stipulated that if the doctor were asked the hypothetical question as to whether the infant’s injuries and condition were causally related to the accident and whether the accident and fall were the competent producing cause of the injuries and condition, the answer would be in the affirmative. The State conceded that the hospital bill of $185 and doctor’s bills of $50 were fair and reasonable. It was stipulated also that claimant sustained a long linear fracture, extending from the region of the ethmoid across the base of anterior fossa and vertically upward into the left frontal bone, and a cerebral concussion, and that he has subjective complaints of occasional headaches and dizziness.
The State moved to dismiss the claim upon the ground that claimant had failed to introduce evidence sufficient to establish a prima facie case, on which motion- decision was reserved.
For the State, Professor Franke, Chairman of the Agricultural Production Division .of the Institute, testified that he had been with the school for 37 years and in 1954 was head of the Department of Animal Husbandry and Dairy Industry, being *384 responsible for all live cattle buildings and personnel where animals were housed. He stated that the milking and feeding operations of livestock were part of the school curricula, the cow barn being considered as a laboratory. Contiguous to the cow barn was a processing room where milk was sold to students and their families. There were barns for bulls and calves, pigs and cows. During the course of a student’s instruction, in the agricultural part of the college, he must go through a course of barn duty. The witness described a plan of the barn as indicating a main building with a double-door front entrance and an addition on each side of the main building, each with a door. The hayloft is in the main building, above the ground floor, and is reached by a stairway on the left side of the barn in an enclosed room known as a locker room. This latter is kept closed by the barn supervisor when he is not there. In that room students changed into their coveralls. The bull barn is about 250 feet away from the cow barn. The barn room leading to the hayloft is locked on a Saturday, Sunday or holiday, and is opened only by the supervisor so that students coming in would have access to the locker room. The day of the accident was a Saturday, and students perform barn duty on a Saturday. There were two ropes 1% inches thick, suspended in tandem 18 inches apart, which were used to lift the hay fork in and out of the barn. However, bales which were about 75 pounds each, were brought in through the main door of the barn, the ropes not having been used for several years as there was no loose hay. On week ends, and on the day in question, one man was off duty in the barn and one man on duty, the man on duty on the day of the accident being Mr. Wallkam. Mr. Ferrand lived in the apartment over the cow barn. Usually Professor Franke assigned 10 students for a two-week period at the cow barn. About 6 feet from the barn door, and 3 feet from the door leading to the locker room, was a sign, 2 feet by 1 foot which read “ Children Not Permitted In Barn Unless Accompanied By An Adult ’ ’, which had been placed there by the witness himself in 1951. In February, 1954 he changed the sign to an embossograph sign with the same legend. The witness was not present at the Institute on the day of the accident.
Mr. Wallkam testified that he has been technical assistant since 1948, Mr. Ferrand being senior to him, except on week ends when their duties were exchanged. On the day of the accident, a Saturday, Mr. Ferrand was not on duty and Wallkam was in charge. When students reported to him that morning at 5 o ’clock, he unlocked the barn door for them and when they *385 left at about 6:30 a.m. he locked up. At about 2:45 p.m. he again unlocked the door for students. The infant claimant did not speak to him then, but when the group of the infant claimant and the two other boys approached him, shortly after 4:00 p.m., David Owen spoke to him. In the entrance area, before the point where the cow stanchions begin, the boy Owen told him that Mr. Ferrand said they could go up in the haymow and play. Ferrand was not in the barn at the time. Wallkam told them they could not go up to play, that he would be ‘ ‘ locking up within half an hour ’ ’ and that £ 1 if they were there the door would be locked and they’d be locked up there all night ”. He testified he had never permitted children to go up and play in the hayloft. After he had had this conversation, he went to the bull barn, 250 feet away, leaving the children in the entrance to the cow barn where he had conversed with them. He returned to the cow barn within 15 or 20 minutes and heard a noise upstairs. With a student, he went above and found the infant claimant sitting on a bale of hay and David Owen and the other boy up on the haystacks. He asked the infant claimant if he had fallen and, receiving an affirmative reply, brought bim downstairs. There they sat him on an office chair and wiped off some blood on the boy’s face where it was scraped. Mr. Ferrand was not present. The boy’s father came within 10 minutes. The boy was conscious throughout. Wallkam told the boy’s father that the boys had been told to stay away from the cow barn, and the father told him that his son would never be at the barn again. Then the father and son walked out of the office. The witness testified he had never seen any children swinging from the ropes in the hayloft. There was a sign there 2 feet by 1% feet prohibiting children from entering unless accompanied by an adult.
On cross-examination, he said that while he was on duty he would not permit children who lived on the campus to go through the barn. He admitted that he did leave the boys in the barn where he had been talking to them. He denied that the boys threw down hay to him and some students. He reiterated that he told David Owen that they could not go up into the hayloft, and that even if Mr. Ferrand said it was all right he still was not allowed to do so, and that he would be locking up in a half hour. Then he went to the bull pen and, returning 15 minutes later with a student, heard the noise in the hayloft and went upstairs.
The State moved to dismiss upon the following grounds: (1) that claimant did not make out a prima facie case in that *386 he has failed to establish freedom from contributory negligence of the infant; (2) that claimant did not establish the existence of a dangerous condition forseeably leading to the injury; (3) that no notice of the existence of a specific dangerous defect was made' known to the State prior to the occurrence; and (4) that claimant did not make out a cause of action by a preponderance of the evidence. Decision thereon was reserved.
Claimant contends that he was an invitee because he was a tenant of the State and that the State failed to maintain the premises in accord with the standard of reasonable care which the law requires of an owner in favor of an invitee. There is a conflict of testimony between claimant’s witnesses and those of the State as to the circumstances which preceded claimant’s entry into the cow barn. Claimant testified that he received approval from Mr. Ferrand and Mr. Wallkam to go into the barn and play; that he had played there before with permission. The boy David Owen corroborated him on the question of receiving permission to play on the day of the accident from Mr. Ferrand and Mr. Wallkam; he testified also that he had seen other boys playing there at other times. State’s witness Professor Franke testified that Mr. Ferrand was not on duty on the date of the accident. Mr. Wallkam testified similarly on this point and further insisted that he did not speak to claimant, did not give such permission to play, that he never permitted children to play there and that he told the boy David Owen that if they were there the door would be locked and they would be locked there all night.
There were other contradictions. Claimant testified that both his parents had instructed him not to enter the barn unless his father were present, that he knew he had no business in the barn and that he knew there was a sign stating that children were not permitted unless accompanied by an adult. David Owen denied there was such a sign on the day of the accident. Claimant’s father testified that the only sign he knew about on the day of the accident was one stating that children were not permitted near the cows; that he had never said anything to his son about playing in the barn, but had cautioned him merely to keep away from the bull pen. On the other hand, Professor Franke and Mr. Wallkam both testified that on the day of the accident the sign was there.
The court does not agree that the infant claimant Avas an invitee. Under all of the circumstances, he was at best a licensee. For there to have been an implied invitation to play in the barn, he would have to have come there for a purpose connected with the business of the State and it would be essen *387 tial that there was a mutuality of interest to which his visit related. (Heskell v. Auburn Light, Heat & Power Co., 209 N. Y. 86.) The mere fact that the boy’s father was a student at the school and that his family lived with him on the school premises was insufficient to constitute the boy an invitee to use the loft of the cow barn where the accident occurred. Upon his "entry therein, where he was not entitled to go, he was a licensee, and the rules as to licensees generally became applicable to him. (Keesey v. O’Reilly, 181 App. Div. 665; Kelly v. McGreevy, 182 App. Div. 584.) The boy went to the barn for his own purposes. He was there not by invitation, but at most by the acquiescence of the State. (Simmons v. Poughkeepsie Sav. Bank, 255 App. Div. 887, affd. 282 N. Y. 626; Walker v. Bachman, 268 N. Y. 294.) The court credits the testimony of Mr. Wallkam to the effect that he told the boys they could not play in the loft. Even if there had been prior permission to enter the cow barn, it was thus revoked. It matters not that Mr. Wallkam then did not eject the boy from the premises. The court finds that there was a sign in the barn reading that children were not permitted in the barn unless accompanied by an adult.
The State owed to the infant claimant no duty of active vigilance and did not owe him the duty even of ordinary care with respect to the condition of the premises or to the buildings or machinery thereon. It was obliged merely to abstain from affirmative negligence, to do no intentional wrong, to cause no intentional injury. (Morse v. Buffalo Tank Corp., 280 N. Y. 110; Holmes v. Delaware & Hudson Co., 128 App. Div. 24.)
The fact that a licensee is a child imposes no duty upon the State of using any greater degree of care than in the case of an adult.' (Parkes v. New York Tel. Co., 120 Misc. 459, affd. 207 App. Div. 869.)
In his brief, claimant contends that the infant was non sui juris and hence that he could not have been guilty of contributory negligence. The infant claimant would have attained the age of 11 years in 5 days. An infant must exercise reasonable care to avoid known danger. He must exercise reasonable care to avoid all unknown danger which ordinary prudence requires him to anticipate, the care being measured by that which an ordinarily prudent person of his age, capacity and experience would have exercised under similar circumstances. (Gloshinsky v. Bergen Milk Transp. Co., 279 N. Y. 54.) The court, having observed the infant claimant at the trial and having noted his judgment, intelligence, experience and education, finds that he was sui juris on the day of the accident and guilty of contributory negligence in swinging from the ropes in the loft. In any *388 event, he has failed to establish the negligence of the State, because he assumed all ordinary risks in his status of a licensee.
All motions heretofore made by the State on which decision was reserved are hereby granted.
The claim is dismissed.
This constitutes the decision of the court in accordance with the provisions of section 440 of the Civil Practice Act.
Let judgment be entered accordingly.